IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LONNIE WINTERS, | ) | |
| | ) | |
| Plaintiff, | ) | 4:03cv3071 |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| STEPHEN O'NIELL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on filing no. 43, the Motion for Summary Judgment filed by the defendants, Dr. Stephen O'Neill, et al., and filing no. 51, the Response filed by the plaintiff, Lonnie Winters. Mr. Winters is presently confined in the Lincoln Regional Center ("LRC") under an involuntary civil commitment pursuant to the Nebraska Mental Health Commitment Act, Neb. Rev. Stat. §§ 71-902 *et seq.* (previously Neb. Rev. Stat. §§ 83-1001 *et seq.*).[1]

## Summary Judgment Standard

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327(1986). The court must examine the record in the light most favorable to the nonmoving party. See, e.g., Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

The proponent of a motion for summary judgment "bears the initial responsibility of

---

[1] "Under the Nebraska Mental Health Commitment Act, the State has the burden of establishing by clear and convincing evidence the defendant's mental illness and dangerousness .... Before a person may be committed for treatment by a mental health board, the board must determine that the person meets the definition of a mentally ill dangerous person as set out in Neb. Rev. Stat. § 83-1009 [now Neb. Rev. Stat. § 71-908] .... To meet that definition of a mentally ill dangerous person, the State must show that the person suffers from a mental illness and that the person presents a substantial risk of harm to others or to himself or herself." In re Interest of E.M., 691 N.W.2d 550, 558 (Neb. App. 2005) (citations omitted).

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323. In response, the opponent must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." Id. at 586.

"[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law .... Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). Accord Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 529 (8th Cir. 2003). "If the evidence is merely colorable ... or is not sufficiently probative ... summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The court may not weigh the evidence, determine credibility, or decide the truth of any factual matter in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.

### Background

After the plaintiff had served a sentence for sexual assault of a child, he was involuntarily committed to the Norfolk Regional Center ("NRC") for evaluation as a mentally ill dangerous person, until he could be admitted to the Lincoln Regional Center ("LRC") or another facility for treatment. The plaintiff alleges that he was "warehoused" at the NRC for eighteen months under deplorable conditions, including grossly unsanitary facilities, lack of exercise or fresh air, no law library, no treatment or programs for sex offenders, none of the passes, home visits and other amenities afforded other patients at the NRC, and lack of appropriate medical treatment. The plaintiff also complains that the defendants failed to conduct a timely evaluation after his admission to the NRC.

The plaintiff seeks damages and injunctive relief, including surgical castration. In previous decisions in this case, I have held that release from confinement is not a remedy

which may be awarded in a civil rights action such as this pursuant to 42 U.S.C. § 1983. Heck v. Humphrey, 512 U.S. 477 (1994).

In addition, because of state sovereign immunity recognized and preserved by the Eleventh Amendment to the United States Constitution, I have explained that the plaintiff may not obtain monetary relief from a state or from any employee of a state in such employee's official capacity. See, e.g., Morstad v. Department of Corrections and Rehabilitation, 147 F.3d 741, 744 (8th Cir. 1998): "[A]bsent a waiver, the Eleventh Amendment immunizes the state and its officials from § 1983 liability."  No waiver of sovereign immunity applies to this case.

I have also held that as a result of his transfer from the NRC to the LRC, the plaintiff cannot recover any injunctive relief from the defendants.  Injunctive relief may not be obtained to improve conditions at a facility from which the plaintiff has been transferred or released.  E.g, Randolph v. Rodgers, 170 F.3d 850, 856-57 (8th Cir. 1999).

The plaintiff's claims for damages because of the absence of a law library at the NRC and for injunctive relief in the form of surgical castration must be dismissed.  As to the law library, I have previously held (filing no. 50 at 2) that because the plaintiff could have requested, but did not, the assistance of an attorney, without cost, pursuant to the "legal assistance policy" of the Nebraska Department of Health and Human Services, the absence of a law library at the NRC did not violate the plaintiff's right of access to the courts.

As for the requested surgery, the Constitution does not require this court to order anyone to perform the surgical castration requested by the plaintiff.   More important, the defendants in this case are employees of the NRC, and, as previously explained, now that the plaintiff is no longer confined at the NRC, this court has no legal basis for entering any order of injunctive relief against staff or medical providers who were employed at that facility.

Thus, I concluded (see filing no. 36 at 5):  "In this litigation, the plaintiff may not obtain the remedies of (a) damages from the defendants in their official capacity, (b) injunctive relief from the defendants in either official or individual capacity, or (c) release from confinement.  On the other hand, the plaintiff may proceed with his damages claims against the defendants in their individual capacity for their direct participation, if any, in a violation of the plaintiff's civil rights while he was confined at the NRC."

**Qualified Immunity**

As for the unsanitary environment and the other conditions experienced by the plaintiff at the NRC, i.e., lack of exercise or fresh air, inadequate treatment and absence of programs for sex offenders, denial of passes, home visits and other amenities, and delayed evaluation, the defendants move for summary judgment on the basis of qualified immunity. A government employee, sued for damages in his or her individual capacity pursuant to 42 U.S.C. § 1983, is entitled to qualified immunity unless the plaintiff shows that the actor violated a "clearly established" federal or constitutional right of the plaintiff.

For a right to be considered "clearly established," the plaintiff must demonstrate that a reasonable person would have known: (a) of the plaintiff's right and (b) that the conduct at issue violated the plaintiff's right. See Anderson v. Creighton, 483 U.S. 635, 639-40 (1987): "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted).

Qualified immunity is the norm. "[The plaintiff's] burden is not easily discharged: 'That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*.'" Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996) (emphasis in original; citation omitted).

As the threshold inquiry for a summary judgment motion based on qualified immunity, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a constitutional right. Brosseau v. Haugen, 125 S.Ct. 596, 598 (2004); Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). "If those facts, once established, would not amount to a constitutional violation, the inquiry ends." McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005). See also Saucier v. Katz, 533 U.S. 194, 201 (2001) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."), *citing* Siegert v. Gilley, 500 U.S. 226, 232 (1991).

If the plaintiff has sufficiently alleged the violation of a constitutional right, "the next

4

inquiry 'is to ask whether the right was clearly established.'" <u>Frye v. Kansas City Missouri Police Dept.</u>, 375 F.3d 785, 789 (8th Cir. 2004) (citation omitted).  The Supreme Court in <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002), explained "clearly established" law as follows.  A government employee charged with the federal criminal offense of willfully and under color of law depriving a person of constitutional rights, under 18 U.S.C. § 242, is entitled to "fair warning" that the conduct in question would deprive the victim of a constitutional right.  <u>Id</u>. at 739-40.  The "fair warning" requirement of 18 U.S.C. § 242 is identical to the qualified immunity standard for a civil damages claim under 42 U.S.C. § 1983.  <u>Id</u>. at 740-41.  Thus, the "salient question" for qualified immunity is whether the state of the law when the defendant acted gave the defendant "fair warning" that his or her conduct was unconstitutional.  <u>Id</u>. at 741.  "If the law did not put the defendant on notice that his or her conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  <u>Saucier v. Katz</u>, 533 U.S. at 202.  Put another way, "[u]nder the doctrine of qualified immunity, 'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'"  <u>Figg v. Schroeder</u>, 312 F.3d 625, 636 (4th Cir. 2002) (citation omitted).

<u>Applicable Law</u>

Persons involuntarily civilly committed have liberty interests under the due process clause of the Fourteenth Amendment entitling them to safety, freedom from bodily restraint, and adequate care while in confinement.  <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982).  They are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  <u>Id</u>. at 322.  Thus, it follows that "all other circumstances being the same, actions of a mental health professional which would violate a prisoner's Eighth Amendment rights would also violate the due process rights of the involuntarily civilly committed."  <u>Dolihite v. Maughon By and Through Videon</u>, 74 F.3d 1027, 1041 (11th Cir. 1996).  For example, "[a]n official violates a prisoner's Eighth Amendment rights when the official is deliberately indifferent to the prisoner's serious medical needs."  <u>Id</u>. at 1041, *citing* <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).

The Eighth Amendment requires prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).  A prisoner's Eighth Amendment rights are violated if

prison officials show "deliberate indifference" to a prisoner's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104-07 (1976).

More specifically, a viable Eighth Amendment claim consists of an objective component and a subjective component. Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998). See also Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997): "To prevail on an Eighth Amendment claim, an inmate must show both an objective element, that the deprivation was sufficiently serious, and a subjective element, that the defendant acted with a sufficiently culpable state of mind." Id.

The objective element of an Eighth Amendment claim requires a deprivation which, viewed objectively, is sufficiently "serious," that is, "the prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities;' or the prison official must incarcerate the inmate under conditions 'posing a substantial risk of serious harm.'" Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998) (citation omitted). In the context of medical care, for example, a medical need is "serious" if it "has been diagnosed by a physician as requiring treatment," or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Camberos v. Branstead, 73 F.3d 174, 176 (8th Cir. 1995) (citation omitted).

The subjective element of an Eighth Amendment claim requires that an official act with deliberate indifference to inmate health or safety. Deliberate indifference means that the official both was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Deliberate indifference describes a mental state more blameworthy than negligence. A plaintiff is not required to show that the defendant acted for the very purpose of causing harm or with knowledge that harm will certainly result. Id., 511 U.S. at 835. However, "deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Olson v. Bloomberg, 339 F.3d 730, 736 (8th Cir. 2003). See also Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003): "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.'" (Citation omitted.)

Defendants' Conduct

The plaintiff's allegations, arguments and evidence are set forth in filing no. 1, the complaint; filing no. 42, the plaintiff's Additional Information to Corroborate Allegations; and

6

filing no. 51, the plaintiff's Evidence and Arguments - Motion for Summary Judgment. The defendants are NRC Chief Executive Officer Rick Gamel, NRC Medical Director Stephen O'Neill, M.D., psychologist Kevin Piske, Ph.D., and licensed clinical social worker Cheryl Heimann.

From his arrival at the NRC on November 19, 2001, the plaintiff vehemently protested his commitment proceedings. In his view, as recorded in NRC clinical notes, he had served his prison sentence, and he should not be punished further under the guise of a civil commitment. As the plaintiff repeatedly informed NRC staff, his attorney had advised him that he did not have to consent to continued confinement or to a psychological evaluation, and the NRC's efforts to evaluate him created a conflict of interest in light of the plaintiff's resistance to the involuntary commitment.

For months, the plaintiff refused to cooperate with any mental health evaluation conducted by NRC professionals without the presence of his attorney, and NRC does not permit the presence of an attorney during a psychological examination. During that period, therefore, the plaintiff remained at NRC under a custody warrant, resulting in his restriction to the ward. Because the NRC provided only evaluations, not treatment for sex offenders, the plaintiff had only limited programs available to him, such as occupational therapy classes (oil painting), work therapy (folding towels), and an exercise program involving a treadmill, exercise bike and walking on the ward.

The plaintiff also complains that he had obtained a clinical evaluation by a physician outside the institution, Dr. Terry Davis. However, the defendants insisted that NRC staff were required to conduct their own evaluation.

In addition, when the plaintiff arrived at the NRC, he was suffering pain from operations he had undergone in prison to remove a testicle. He could not use the exercise machines available to him at the NRC without experiencing pain in his groin. The plaintiff gained a considerable amount of weight during his stay at the NRC, and when he ultimately transferred out of the NRC, he had developed lung and fibrocystic breast diseases.

On two occasions, the plaintiff believes that the defendants sabotaged his efforts to find treatment outside the NRC. On or about April 30, 2002, the plaintiff persuaded the defendants to allow him to be evaluated at the Veterans' Hospital ("VA") for the pain in his groin. A doctor at that facility stated she could remove scar tissue to ease the plaintiff's discomfort, but the NRC "turned down" that procedure. In addition, Dr. O'Neill needlessly

informed the VA that the plaintiff was a pedophile, breaching the plaintiff's confidentiality. On another occasion, the plaintiff tried to obtain a mental health placement at the House of New Life on an outpatient basis, but defendant-Heimann, as his NRC social worker, did not support that placement, expressing the view that because of inappropriate conduct by the plaintiff at the NRC, he would not be a suitable candidate for outpatient treatment.

The plaintiff eventually obtained some outdoor privileges, passes, home visits and amenities available to other residents of the NRC. The defendants attribute the commencement of those privileges to the plaintiff's eventual agreement to cooperate in a mental health evaluation as a sex offender. However, the plaintiff notes that he began receiving the privileges approximately four months before the evaluation occurred.

Conclusions

As the plaintiff describes his stay at the NRC, defendant-Rick Gamel, NRC Chief Executive Officer, had no direct involvement in any aspect of the plaintiff's treatment, confinement or medical care. As previously explained, Gamel may not be held liable solely on principles of vicarious liability or respondeat superior for constitutional injuries allegedly inflicted by subordinates. See, e.g., Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 778 (8th Cir. 2001), citing Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997) and City of Canton v. Harris, 489 U.S. 378, 385 (1989). The plaintiff has not demonstrated the existence of a genuine issue of material fact on which this case could proceed to trial against defendant-Gamel.

As for the other defendants, it is clear that none of the defendants had any responsibility for the plaintiff's commitment. In fact, Dr. Piske openly states that he does not consider pedophilia a mental illness. It is also clear that once a court committed the plaintiff' to the NRC for an evaluation, the defendants were required to conduct the evaluation. The plaintiff's resistance to the court-ordered mental health evaluation contributed to the delay in transferring the plaintiff out of the NRC to a facility which offered treatment programs. The defendants were not unreasonable in requiring the plaintiff's compliance with the court-ordered evaluation or in restricting the plaintiff to the building while he was confined on a custody warrant.

As for the medical and mental health treatment received by the plaintiff during his confinement at the NRC, the plaintiff's due process rights were at least equivalent to the comparable Eighth Amendment rights of the criminally committed. However, differences

of opinion, mistakes, and even medical malpractice do not meet the exacting standard of the Eighth Amendment for cruel and unusual punishment.  A plaintiff who alleges no more than his disagreement with the course of treatment provided to him does not demonstrate an Eighth Amendment violation.  See, e.g., Jones v. Norris, 310 F.3d 610, 612 (8th Cir. 2002):  "At best, [the plaintiff's] allegations state a difference in opinion between himself and his doctors or allege a mistake in classification or treatment.  Neither differences of opinion nor medical malpractice state an actionable Constitutional violation." Accord Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991): "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  See also Kayser v. Caspari, 16 F.2d 280 (8th Cir. 1994) (plaintiff's disagreement with the course of treatment provided to him is not a sufficient basis for an Eighth Amendment claim).

In this case, the plaintiff deeply resented his confinement at the NRC, for understandable reasons.  However, the plaintiff has not demonstrated the violation of a constitutional right, and he has not established that any of the defendants' acts violated clearly established law.   The defendants' motion for summary judgment will be granted.

THEREFORE, IT IS ORDERED:

1. That filing no. 43, the Motion for Summary Judgment filed by the defendants, Dr. Stephen O'Neill, et al., is granted, and filing no. 51, the Response filed by the plaintiff, Lonnie Winters, is overruled;

2. That the plaintiff's complaint and this action are dismissed with prejudice; and

3. That a separate judgment will be entered accordingly.

January 17, 2006.            BY THE COURT:

/s *Richard G. Kopf*
United States District Judge